1  JOSEPH P. RUSSONIELLO (California Bar No. 44332)
   United States Attorney
2  JOANN M. SWANSON (California Bar No. 88143)
   Chief, Civil Division
3  CLAIRE T. CORMIER (California Bar No. 154364)
   Assistant United States Attorney
4  JENNIFER S WANG (California Bar No. 233155)
   Assistant United States Attorney
5
     150 Almaden Boulevard, Suite 900
6    San Jose, California 95113
     Telephone: (408) 535-5082
7    Facsimile: (408) 535-5081
     Email: claire.cormier@usdoj.gov
8
   Attorneys for Defendant
9  MICHAEL J. ASTRUE

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13 | KIMBERLY FREEMAN,                     )   Case No. 06-4900 JSW
                                           )
14 |              Plaintiff,               )   **DEFENDANT'S OBJECTIONS TO**
                                           )   **PLAINTIFF'S DEPOSITION**
15 |         v.                            )   **DESIGNATIONS**; ORDER ON OBJECTIONS
                                           )
16 | MICHAEL J. ASTRUE, Commissioner,      )   Courtroom: 2, 17th Floor
     Social Security Administration,       )   Hon. Jeffrey S. White
17 |                                       )   Trial Date: December 8, 2008
                  Defendant.               )
18                                         )
                                           )
19 |_____)

20
          Defendant's objections to plaintiff's designations of the transcript of Victoria Currey's
21
   deposition are attached as Attachment A. Defendant served his objections on November 21,
22
   2008. The parties met on November 21, 2008 and reached an agreement regarding some of
23
   defendant's objections. Accordingly, those objections have been withdrawn and are not included
24
   as part of Attachment A.
25
                                          Respectfully submitted,
26 | DATED: November 25, 2008             JOSEPH P. RUSSONIELLO
                                          United States Attorney
27
28                                        _____
                                          JENNIFER S WANG
                                          Assistant United States Attorney

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S DEPOSITION DESIGNATIONS
Case No. C 06-4900 JSW

.

# ATTACHMENT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

KIMBERLY FREEMAN,                   )
                                    )
            Plaintiff,              )
                                    )
        v.                          )
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner, Social                )   Case No. **06-4900 JSW**
Security Administration,            )
                                    )
            Defendant.              )

DEPOSITION OF

VICTORIA CURREY

FRESNO, CALIFORNIA

NOVEMBER 28, 2007

REPORTED BY:   COURTNEY M. TALLY, CSR 13050

1320 EAST SHAW AVENUE, SUITE 168
FRESNO, CALIFORNIA 93710
(559) 224-5511 or 1-800-248-6611



| | | |
|---|---|---|
| 0:09:27 | 1 | Michael Astrue, Commissioner of Social Security |
| 0:09:29 | 2 | Administration. |
| 0:09:29 | 3 | THE VIDEOGRAPHER: Will the court reporter please |
| 0:09:32 | 4 | swear in the witness. |
| 0:09:34 | 5 | -c0o- |
| 0:09:34 | 6 | VICTORIA CURREY |
| 0:09:34 | 7 | having first been duly sworn, was |
| 0:09:34 | 8 | examined and testified as follows: |
| 0:09:34 | 9 | EXAMINATION |
| 1:04:45 | 10 | BY MS. CORMIER: |
| 0:09:46 | 11 | Q. Good morning, Ms. Currey. |
| 0:09:47 | 12 | A. Good morning. |
| 0:09:47 | 13 | Q. Could you please state your full name for the |
| 0:09:47 | 14 | record and spell your last name. |
| 0:09:47 | 15 | A. Victoria Lynn Currey, C-u-r-r-e-y. |
| 0:09:55 | 16 | Q. Have you ever had your deposition taken |
| 0:10:01 | 17 | before? |
| 0:10:01 | 18 | A. No. |
| 0:10:01 | 19 | Q. I'd like to go over a little bit about the |
| 0:10:02 | 20 | ground rules even though you and I have talked about |
| 0:10:04 | 21 | what a deposition is, just so that it's clear. First of |
| 0:10:06 | 22 | all, you are under oath which means that your testimony |
| 0:10:10 | 23 | today has the same force and effect as if you were |
| 0:10:12 | 24 | testifying in a court of law, even though we're in less |
| 0:10:16 | 25 | formal surroundings. |

| | |
|---|---|
| 0:30:06 1 | When I go to your desk to assist you, I kneel |
| 0:30:06 2 | by your desk and help you with the computer. I don't |
| 0:30:12 3 | stand over you, I don't order you. But I do |
| 0:30:12 4 | communicate. Communication is the number one principle |
| 0:30:16 5 | of a supervisor. |
| 0:30:15 6 | Q. And did you do that with Kimberly? |
| 0:30:17 7 | A. Absolutely. |
| 0:30:16 8 | Q. And how did she respond if you pointed out to |
| 0:30:19 9 | her that she was making an inappropriate personal phone |
| 0:30:21 10 | call? |
| 0:30:22 11 | A. Kimberly, like I said, never truly had a |
| 0:30:25 12 | touch with reality. I would talk to her. She would |
| 0:27 13 | come in smiling during the meeting, I'd close the door. |
| 0:29 14 | And most of my employees when I said I wanted to talk to |
| 0:30:31 15 | them knew because I was serious. |
| :30:32 16 | But Kimberly would come in smiling and say, |
| :30:36 17 | Oh, I don't think I'm doing that. Oh, okay, I'll do |
| :30:36 18 | better -- and walk out of the room, do exactly what she |
| :30:42 19 | was doing before I talked to her. |
| :30:46 20 | Q. Did you form an opinion as to whether |
| :30:47 21 | Ms. Freeman had a problem staying on a task that had |
| :30:51 22 | been assigned to her? |
| :30:51 23 | A. She verbalized it to me, myself. She said, I |
| :30:55 24 | have trouble in the morning doing all that paperwork. I |
| :31:02 25 | just can't stay seated. I just can't stay focused on |

```
0:31:06  1    that.
0:31:06  2           So I gave her another alternative.  I said,
0:31:06  3    Since you do like to talk on the phone, why don't you do
0:31:10  4    some of your follow-ups on the phone, but you have to
0:31:14  5    write it on an RC pad so if we have to terminate the
0:31:16  6    benefits, we have followed the proper procedures for due
0:31:17  7    process.  So I said, You can do that.  I said, But other
0:31:19  8    than that, you still need to stay at your desk and work,
0:31:23  9    and be successful at your paperwork.
0:31:27 10           Part of the job was the paperwork.  The other
0:31:27 11    part is the public.  One of her other comments to me
0:31:31 12    shortly when she came back was, Sometimes I hate to talk
0:31:32 13    to the public.  She was a brand new employee.  She
0:31:36 14    didn't want to focus on her paperwork.  She told me --
0:31:38 15    these were her own words, That sometimes I hate to talk
0:31:42 16    to the public.  I have trouble focusing on my paperwork.
0:31:46 17    These were her words.
0:31:47 18       Q.   And given that she made those comments to you
0:31:49 19    did you -- did that give you cause for concern about her
0:31:51 20    ability to do this particular job?
0:31:53 21       A.   Absolutely.  And I addressed that with her.
0:32:01 22    I·said, Kimberly this is a -- this is the job you do.  I
0:32:02 23    said, you have mail coming in everyday which is
0:32:06 24    paperwork.  You generate paperwork at the front.  I
0:32:08 25    said, You have to talk to the people.  And I said, You
```

0:32:10  1  have to be compassionate and listen.

0:32:12  2          So when someone comes into the office, what I

0:32:14  3  expect for you to do is to sit at the desk, greet them

0:32:17  4  with a smile and listen to what they have to say.  Then

0:32:19  5  take the action to complete whatever it needs.

0:32:21  6          Full interview.  That means that they receive

0:32:23  7  concurrent benefits.  You take care of both the Title-2

0:32:27  8  and the Title-16.  Whatever they need, you take care of

0:32:29  9  it before you release them.  I don't want to see them

0:32:32 10  back in the office.  I don't want to see them upset.

0:32:36 11      Q.  Did you ever have an occasion that you became

0:32:38 12  aware of that you felt she didn't complete the interview

0:32:40 13  as you just described?

*Objection: FRE 106, FRCP 32(a)(1), lines 26:20 to 28:10  Sustained  [illegible]*

0:32:42 14      A.  Yes.  Like I said, it was still within her

*for competence*
*Overruled*

0:32:44 15  first year and a lady had come into the office.  I

0:32:46 16  believe her name was Ms. Harris, and she had not

0:32:49 17  received her check.  She was screened at the front

0:32:51 18  window and Kim was the supervisor -- service rep for the

0:32:55 19  day so she took the interview.

0:33:01 20          She apparently, according to Ms. Harris and

0:33:04 21  according to the records that we can see, did not take

0:33:06 22  any action for Ms. Harris.  Ms. Harris had a change of

0:33:08 23  address, a Title-2 change of address, a Title-16 change

0:33:12 24  of address and wages that needed to be input.

0:33:14 25          She did not change the Title-2 address.  She

0:33:17 1 | did not change the Title-16 address.  She referred it to
0:33:19 2 | a claims representative to do the wage input.  A
0:33:21 3 | Title-16 claims representative -- they do not do Title-2
0:33:23 4 | work.
0:33:23 5 |      She atleast was responsible for changing the
0:33:27 6 | Title-2 address.  She could have defaulted perhaps the
0:33:31 7 | Title-16 address to the claims representative, but she
0:33:34 8 | should have told him that.  When she came back in two to
0:33:36 9 | three days later, no address had been changed.  The
0:33:38 10 | claims representative hadn't even changed it.
0:33:42 11 |     Q.   You talk about Title-2 and Title-16.
0:33:42 12 |      Could you just explain briefly what those
0:33:46 13 | are.
0:33:45 14 |     A.   Title-2 is the Social Security Retirement
0:33:47 15 | Survivor's Insurance.  Title-16 is the Supplemental
0:33:51 16 | Security Income.  It's the needs-based program that
0:33:53 17 | Social Security offers.
0:33:53 18 |     Q.   And this --
0:33:55 19 |      To your understanding this claimant had
0:34:01 20 | issues with both of those types of benefits?
0:34:03 21 |     A.   Yes.  She received two checks.
0:34:06 22 |     Q.   Now, did the fact that Ms. Freeman didn't do
0:34:08 23 | the change of address on that particular day affect
0:34:12 24 | whether or not that person would get her next check?
0:34:16 25 |     A.   We still have a window of time.  We have till

0:34:17  1  about the 10th or the 15th of a month to change a

0:34:19  2  person's address for the following month. But that's

0:34:23  3  not the point. The point is complete service.

0:34:25  4  *Objection: FRE 106, FRCP 32(a)(6), lines 30:2 to 30:12 should be included for completeness. Overruled[1]*
When someone comes into the office the first

0:34:29  5  time we need to take care of them. We don't expect

0:34:32  6  people to come back to the office. There's alternatives

0:34:34  7  that can be offered to a person when they're there the

0:34:36  8  first time if she didn't get her check.

0:34:38  9       Kimberly's response was come back in two to

0:34:38 10  three days and we'll issue a payment. And that's what

0:34:42 11  she told the lady, nothing more, nothing less and sent

0:34:46 12  her over to see a Title-16 claims representative.

0:34:46 13       Q.  When this incident occurred with the person

0:34:49 14  that you believe was named Ms. Harris, did you talk to

0:34:51 15  Kimberly about that?

0:34:53 16       A.  Yes.  As with all complaints it is office

0:34:55 17  procedure that we do talk to the person involved and we

0:35:02 18  let them read the statement because we're not hiding

0:35:04 19  anything.  So we talk to the person.  We allow them to

0:35:06 20  read the statement that person has written up.

0:35:08 21       I told her this.  She read it, she indicated

0:35:12 22  to me that she didn't feel that she had misserviced her.

0:35:14 23  She didn't truly understand the immediate payment

0:35:17 24  process so I explained it to her again.  Explained to

0:35:19 25  her that it's not an absolute given that we'll issue a

---

[1] Plaintiff must read the additional lines requested by Defendant.

```
0:38:38  1  testimony.

0:38:44  2       MS. CORMIER:  I'm going to object.  It's

0:38:44  3  argumentative that you're calling it scripted.  But I

0:38:46  4  will ask you --

0:38:47  5       MS. DRYOVAGE:  She's answering it before you even

0:38:47  6  ask the question.

0:38:49  7       MS. CORMIER:  Well, I will ask her another

0:38:51  8  question.

0:38:53  9       Q.   Can you tell me how you choose mentors in

0:38:53 10  your office?

0:38:53 11       A.   A mentor is chosen --

0:39:01 12       MS. DRYOVAGE:  Objection.  Failure to lay

0:39:01 13  foundation that she was the one that chose the mentors.

0:39:08 14       MS. CORMIER:  Alright.

0:39:08 15       Q.   Did you choose the mentors Ms. Galan and

0:39:08 16  Ms. Freeman?

0:39:10 17       A.   Absolutely.

0:39:10 18       Q.   How did you choose them?

0:39:12 19       A.   I picked the two most experienced service

0:39:16 20  representatives.  I spoke with them directly and told

0:39:17 21  them exactly what I expected out of them.  They were

0:39:21 22  very well-versed in the POMS.  They were both very

0:39:23 23  knowledgeable and very friendly and they could teach.

0:39:27 24  Because I told them, You have to be able to teach, you

0:39:31 25  have to know it and you have to --
```

*Objection: FRE 106, FRCP 32(a)(6), lines 34:24 to 34:25, and 35:16 to 35:13 should be included for completeness. Overruled[2]*

[2] Plaintiff must read the additional lines requested by Defendant.

0:39:31 1    MS. DRYOVAGE: Objection. Goes beyond the scope of

0:39:32 2    the question.

0:39:34 3    MS. CORMIER: I disagree.

0:39:36 4    Q. If you're explaining how you chose mentors

0:39:38 5    please continue.

0:39:42 6    A. So they were both -- I spoke to both of them,

0:39:44 7    told them what I expected from them. I reduced the work

0:39:46 8    load 50 percent so that they could be part of being a

0:39:47 9    mentor so they would have the time to teach the trainees

0:39:51 10   what they needed to know.

0:39:53 11   Like I said, it was Sandra Knox and Brenda

0:40:01 12   Sabatini. They were two of my most experienced,

0 40:02 13   knowledgeable service reps I had at the time.

0.40:06 14   Q. And what was their race?

0:40:10 15   A. One was African American and one was

0:40:14 16   Caucasian.

0:40:14 17   Q. Was it Sandra Knox who was African American?

0:40:17 18   A. Yes.

0:40:25 19   Q. When Ms. Freeman and Ms. Galan started

0:40:31 20   working in the Fresno office did you have a method that

0:40:32 21   you asked them to follow so that you could check the

0:40:34 22   accuracy of their work?

0:40:36 23   A. Absolutely. As with all trainees, I reviewed

0:40:38 24   their work 100 percent. I had asked both of them to

0:40:44 25   keep an input file for me so everything they had done

```
0:40:46  1    that week in a folder so I could review it at the end of
0:40:49  2    the week.  And I ask them to give it to me themselves.
0:40:53  3         Q.   And did Ms. Freeman do that?
0:40:55  4         A.   No.
0:40:55  5         Q.   Did you ask her for the folder?
0:41:01  6         A.   Yes.
0:41:01  7         Q.   Did she explain to you why she didn't have
0:41:04  8    one for you?
0:41:04  9         A.   She said she had done the inputs, checked
0:41:08 10    them herself and just didn't feel the need to keep
0:41:10 11    anything.
0:41:10 12         Q.   Did Ms. Galan keep a folder?
```
Objection: FRE 106, FRCP 32(a)(6), lines 35:19 to 36:2 should be included for completeness!  Overruled[3]
```
0:41:14 13         A.   Absolutely.
0:41:14 14         Q.   Did she show it to you on a weekly basis?
0:41:16 15         A.   She gave it to me every week.
0:41:17 16         Q.   Were there sometimes errors?
0:41:17 17         A.   Yes.
0:41:19 18         Q.   Did that concern you?
0:41:19 19         A.   No.
0:41:19 20         Q.   Why not?
```
Objection: FRE 106, FRCP 32(a)(6), lines 36:23 to 37:3 should be included for completeness  Overruled[4]
```
0:41:20 21         A.   Because trainees make errors and I explain
0:41:23 22    that to them.  I do not care.  I said, Everyone makes
0:41:27 23    mistakes.  But what I expect from you is if you make a
0:41:29 24    mistake, you find your own mistakes.  You acknowledge
0:41:32 25    it, you bring it to my attention and you fix it.
```

[3] Plaintiff must read the additional lines requested by Defendant.
[4] Plaintiff must read the additional lines requested by Defendant.

```
).41:34  1         I don't expect them to be perfect.  But
):41:38  2  again, each input was a person's life.  If you did it
):41:42  3  incorrectly --
):41:41  4     MS. DRYOVAGE:  Objection.  Goes beyond the scope of
::41:44  5  the question.
:41:45  6  BY MS. CORMIER:
:41:46  7     Q.    Is one of the reasons for keeping the weekly
:41:47  8  folder because of your service concerns to the public?
:41:51  9     A.    Absolutely.
:41:51 10     Q.    Why?
:41:53 11     A.    Because every item that you input, if you
:41:55 12  input a wrong change of address the person doesn't get
:...:02 13  their checks.  You input an erroneous wage, you cause an
 42:04 14  overpayment that could be incorrect.
:42:06 15         If you input a representative payee action
:42:10 16  and don't check it, the checks could go to a different
:42:14 17  person.  Everything you do at Social Security has a
:42:16 18  consequence.
:42:16 19     Q.    And so if you were able to check the work on
:42:19 20  a weekly basis because of keeping a folder, would you be
:42:23 21  able to catch errors more quickly and correct them?
 42:24 22     A.    Yes, because you do have a window of time.
 42:27 23  And like I said before, the checks, you can do an input.
 42:29 24  Then you have by the 10th of each month, you know, to do
  :31 25  something.  So if you had done -- if you had completed
```

| | |
|---|---|
| 0:45:44 1 | Ms. Sabatini or Ms. Knox next door? |
| 0:45:49 2 | Would it be okay for her to ask a quick |
| 0:45:49 3 | question of another service representative? |
| 0:45:50 4 | A.   Oh, yeah.  Absolutely.  I don't expect for |
| 0:45:53 5 | them to come running back to me for every little thing. |
| 0:45:55 6 | So if it was just to verify something that they already |
| 0:46:01 7 | knew, just check with somebody, that was fine.  But if |
| 0:46:04 8 | it was going to become a detailed explanation or take |
| 0:46:08 9 | someone's time, it needed to be my time or the mentor's |
| 0:46:12 10 | time because all the other employees had 100 percent |
| 0:46:12 11 | workloads. |
| 0:46:14 12 | Q.   Did you ever observe Ms. Freeman spending a |
| 0:46:17 13 | significant amount of time with a single service |
| 0:46:19 14 | representative that was not one of the mentors? |
| 0:46:23 15 | A.   Yes.  I experienced one day -- Francis Hopson |
| 0:46:27 16 | was one of the other service representatives.  She was a |
| 0:46:31 17 | senior service representative, I have to give you |
| 0:46:31 18 | that -- but I was having difficulty with her own |
| 0:46:34 19 | workload. |
| 0:46:36 20 | ~~Her desk was extremely backlogged and I was~~ |
| 0:46:36 21 | working with her to work on her backlog.  She was having |
| 0:46:38 22 | health issues and other personal problems.  One morning |
| 0:46:42 23 | it was actually Francis' adjudication day, so Francis |
| 0:46:46 24 | was free to work at her desk, which meant it's kind of a |
| 0:46:47 25 | sacred day.  You're not assigned work. |

Handwritten annotation by line 14–15: Objection: FRE 106, FRCP 32(a)(6), lines 41:20 to 41:25 should be included for completeness. Overruled[5].

---

[5] Plaintiff must read the additional lines requested by Defendant.

| | |
|---|---|
| 0:46:49 1 | Q.    Can you explain what adjudication day is? |
| 0:46:51 2 | A.    It's a day where you do not have an |
| 0:46:53 3 | assignment to interview the public.  It's a day where |
| 0:46:55 4 | you are allowed to work your paperwork at your desk all |
| 0:47:02 5 | day long.  You kind of set your own schedule. |
| 0:47:06 6 | So that morning, Francis usually shows up -- |
| 0:47:08 7 | she was not one of my early people.  So she was probably |
| 0:47:10 8 | shortly before 8:00 or shortly thereafter.  I noticed |
| 0:47:12 9 | her over at Kim's desk and I thought, Okay, I could see |
| 0:47:17 10 | what was going since I was close to Kim and Teresa's |
| 0:47:17 11 | desk.  And I was seeing it and I thought, Why is Francis |
| 0:47:21 12 | there?  And I thought, Well, okay.  So I watched. |
| 0:47:23 13 | Francis was sitting -- rolled a chair up and was with |
| 0:47:27 14 | Kimberly until 9:30. |
| 0:47:29 15 | Now, Kimberly was not on adjudication which |
| 0:47:31 16 | meant she had a function to do at 9 o'clock.  She was |
| 0:47:34 17 | supposed to be answering the phones.  I sat there and |
| 0:47:36 18 | waited to see how long it was going to take.  They |
| 0:47:40 19 | weren't breaking it up.  So at 9:30 I went over to |
| 0:47:42 20 | Kimberly.  I said, Kimberly, don't you have an |
| 0:47:44 21 | assignment today?  She said, Yeah, but I'm working with |
| 0:47:47 22 | Francis.  And I said, Francis, this is done.  You go |
| 0:47:47 23 | back to your desk.  You're on adjudication and Kimberly |
| 0:47:51 24 | you answer the phone. |
| 0:48:04 25 | Q.    Did you have concerns that that interaction |

*Handwritten annotation:* Objection: FRE 106, FRCP 32(a)(6), lines 42:1 to 42:5 and 42:15 to 42:24 should be included for completeness. Overruled[6]

[6] Plaintiff must read the additional lines requested by Defendant.

0:49:06 1      Q.    Did you encourage your employees to come to

0:49:08 2  you if they had questions?

0:49:10 3      A.    Absolutely.  Because of my knowledge,

0:49:12 4  everyone in the office, claims representatives,

0:49:14 5  supervisors, my service representatives, I was available

0:49:17 6  to anyone.  My policy is you are serving the public.

0:49:21 7  You come first.  So if you would come to my desk, no

0:49:25 8  matter how busy I was and no matter what I was doing, I

0:49:25 9  stopped what I was doing, I turned around, I looked you

0:49:29 10 in the eye and said, How can I help you?  Because

0:49:32 11 service to me was my goal, was everyone's goal.  That's

0:49:36 12 what Social Security's about.

0:49:38 13      So you were serving the public.  I wasn't

0:49:40 14 interviewing.  So if you came to my desk for any reason

0:49:44 15 no matter who you were, I stopped what I was doing, I

0:49:46 16 assisted you no matter how long it took.  Everyone felt

0:49:49 17 welcome at my desk.

0:50:01 18      Q.    Did Ms. Freeman come to you with questions?

0:50:04 19      A.    No.

0:50:04 20      Q.    Did Ms. Galan come to you with questions?

*Objection: FRE 106, FRCP 32(a)(6), lines 44:21 to 45:4 should be included for completeness* Overruled[7]

0:50:08 21      A.    Teresa was at my desk on a continuous basis.

0:50:10 22 She knew my knowledge base.  It doesn't take long to

0:50:14 23 figure out my knowledge base.  And she knew there were

0:50:16 24 things that I could help her with.  Even -- like I said,

0:50:17 25 her mentors were interviewing and they weren't always

[7] Plaintiff must read the additional lines requested by Defendant.

| | | |
|---|---|---|
| 0:50:19 | 1 | available because they too had a schedule. |
| 0:50:23 | 2 | In the morning they were available, but if |
| 0:50:23 | 3 | you had a question during the day it was hard to get to |
| 0:50:27 | 4 | your mentor, but I was available. |
| 0:50:34 | 5 | Q. When you first began to notice some of the |
| 0:50:38 | 6 | problems that you discussed with Ms. Freeman's behavior, |
| 0:50:42 | 7 | did you document that? |

Objection: FRE 106, FRCP 32(a)(6), lines 45:12 to 45:19 should be included for completeness

| | | |
|---|---|---|
| 0:50:44 | 8 | A. She was a trainee. We don't go -- my  Overruled[8] |
| 0:50:46 | 9 | intention was never to document a trainee. That's not |
| 0:50:49 | 10 | the purpose. The purpose is to encourage them, to |
| 0:50:53 | 11 | instruct them, to make them successful. There was no |
| 0:50:55 | 12 | reason at first to document Kim. But as time went on, I |
| 51:02 | 13 | saw no improvement. I was becoming very frustrated with |
| 0:51:06 | 14 | Kimberly. |
| 0:51:08 | 15 | I'm a very demonstrative person. I set high |
| 0:51:10 | 16 | standards for myself as well as for my unit. Again- |
| 0:51:14 | 17 | service, service, service. She was failing to follow my |
| 0:51:17 | 18 | directives, follow my orders. And at that point I did |
| 0:51:21 | 19 | become concerned. |
| 0:51:23 | 20 | Q. At some point did you start documenting |
| 0:51:27 | 21 | incidents that you noted with Ms. Freeman? |
| 0:51:28 | 22 | A. Yes. I had numerous conversations with my |
| 0:51:29 | 23 | supervisor, Bobbie Summers. And on one of my last |
| 0:51:31 | 24 | conversations, she said, Well, Vicky, is Kim really |
| 10:51:34 | 25 | improving? And I said, No. I said, I talked to her, |

[8] Plaintiff must read the additional lines requested by Defendant.

| | | |
|---|---|---|
| 0:52:46 | 1 | How often did you talk to Ms. Summers about |
| 0:52:47 | 2 | Ms. Freeman? |
| 0:52:49 | 3 | *Objection: FRE 106, FRCP 32(a)(b), (lines 47:3 to 47:13 should be included for completeness* A. We usually had a weekly meeting. And if Overruled[9] |
| 0:52:51 | 4 | things would come up in between, I would talk to Bobbie. |
| 0:52:55 | 5 | At points, like I said, when I would notice that |
| 0:53:02 | 6 | Kimberly -- when I did review some of her work because |
| 0:53:06 | 7 | she wouldn't give me a review folder -- but I was still |
| 0:53:06 | 8 | able to go up and pull certain reports and so forth and |
| 0:53:10 | 9 | check on certain things. |
| 0:53:10 | 10 | And when I would see just mistakes that were |
| 0:53:14 | 11 | just, you know, shouldn't have been made, I would get |
| 0:53:17 | 12 | frustrated. So I did have conversations with Bobbie in |
| 53:21 | 13 | regard to that. |
| 0:53:23 | 14 | Q. And did you have conversations with |
| 0:53:25 | 15 | Ms. Freeman about these various problems that you were |
| 0:53:29 | 16 | seeing? |
| 0:53:29 | 17 | A. Yes. We communicated. I went to her, though |
| 0:53:32 | 18 | she never came to me. I said, Kim, you made this |
| 0:53:36 | 19 | mistake. If you had a question, why didn't you come see |
| 0:53:38 | 20 | me? Why are you doing this? |
| 0:53:40 | 21 | And again, she'd say, Well, you know, I |
| 0:53:40 | 22 | wanted to get it off my desk. This paperwork is getting |
| 0:53:44 | 23 | on my desk, is beginning to stack up. She wanted to |
| 0:53:47 | 24 | take shortcuts. She wanted to expedite inputs. She |
| 0:53:51 | 25 | wanted to get the things off her desk and she wanted to |

[9] Plaintiff must read the additional lines requested by Defendant.

```
0:56:17  1  have much interaction with Ms. Singer during the time
0:56:19  2  period that Ms. Freeman worked there?
0:56:23  3       A.    No.
0:56:23  4       Q.    Why not?
0:56:25  5       A.    Paula spent most of her time behind closed
0:56:29  6  doors in her office.  Again, she wasn't my immediate
0:56:32  7  supervisor.  I would not just walk into her office.  The
0:56:34  8  door was shut most of the time and there was no need to
0:56:40  9  communicate with her.  My communication was with Bobbie
0:56:44  10 Summers.
0:56:45  11      Q.    During those first several months that you
0:56:46  12 worked in Fresno did you form an impression of Paula
0:56:49  13 Singer based on your observations with her?
0:56:50  14      A.    Yes.  Like I said, my interaction was very
0:56:53  15 limited, but my impression was that she was a hard
0:56:55  16 worker, but she also wasn't very friendly.  When she
0:57:04  17 would come out of the office, she would come out with a
0:57:04  18 frown on her face and I would presume it was because of
0:57:06  19 whatever she was concentrating on in her office that,
0:57:10  20 you know, she was working hard on something.  But when
0:57:12  21 she left the office she did not appear to be very
0:57:16  22 approachable.
0:57:16  23      Q.    Did you ever point that out to Ms. Singer?
0:57:19  24      A.    Not for a very long time.  I do, you know --
0:57:21  25 when I do become comfortable with someone, eventually
```

Objection: Pursuant to FRCP 37(a)(6), lines 50:16 to 51:10 should be included for completeness

Overruled[10]

[10] Plaintiff must read the additional lines requested by Defendant.

```
0:57:27  1   probably after the first year because we did begin to
0:57:29  2   get a relationship, I did tell Paula.  I told her.  I
0:57:31  3   said, Paula, I don't know if you realize this, but the
0:57:34  4   only time that the people see you outside your office is
0:57:38  5   when you leave that door.
0:57:38  6           So you need to leave that room with a smile
0:57:40  7   on your face.  I don't care what happened inside that
0:57:42  8   room, no matter what conversation or phone calls you
0:57:46  9   had, but as soon as you leave that room, you need to
0:57:46 10   smile.
0:57:47 11           I said, Even when you're just walking to the
0:57:51 12   bathroom, because that's all the people on the floor
0:57:51 13   see.  And they are all under the impression that you're
0:57:53 14   unapproachable and you're mean.  I said, Because that's
0:57:55 15   the impression that you give.
0:58:10 16   Q.    How did the subject first arise of possibly
0:58:12 17   terminating Ms. Freeman?
0:58:14 18   A.    I was having one of my conversations with
0:58:17 19   Bobbie again, one of my frustrating conversations of how
0:58:21 20   Kim would not listen to me.  To me she was blatantly
0:58:27 21   disregarding my directives.  It wasn't because she would
0:58:27 22   say no to my face because that's not Kim.  But she
0:58:31 23   wouldn't do what I'd ask her.
0:58:32 24           And after a time I became so frustrated.  It
0:58:34 25   was like -- I just could not reach her.  No matter how
```

*Objection: Pursuant to FRCP 32(a)(6), lines 50:16 to 51:10 should be include for completeness*

*Overruled[11]*

[11] Plaintiff must read the additional lines requested by Defendant.

| | | |
|---|---|---|
| 0:59:51 | 1 | take any action.  You know, you need to start making |
| 0:59:53 | 2 | memory joggers and we will talk to LMR and find out what |
| 1:00:02 | 3 | steps can be taken. |
| 1:00:04 | 4 | Q.    And did you actually talk -- |
| 1:00:06 | 5 | What is LMR? |
| 1:00:08 | 6 | A.    It's Labor Relations? |
| 1:00:10 | 7 | Q.    So did you actually talk to the folks in |
| 1:00:10 | 8 | Labor Relations or did Bobbie Summers do that or both? |
| 1:00:14 | 9 | A.    Bobbie called.  She put it on the speaker and |
| 1:00:16 | 10 | she talked to them and got the answers.  And I might |
| 1:00:19 | 11 | have said a couple of things, but it was pretty much, |
| 1:00:23 | 12 | you know, listening on the speaker phone as to what LMR |
| 1:00:25 | 13 | gave us direction. |
| 1:00:26 | 14 | Q.    Do you remember who it was at Labor Relations |
| 1:00:26 | 15 | that you spoke to? |
| 1:00:29 | 16 | A.    No. |
| 1:00:29 | 17 | Q.    And what direction did Labor Relations give |
| 1:00:32 | 18 | you or Ms. Summers? |
| 1:00:34 | 19 | A.    Basically they said that she was a FCIP.  She |
| 1:00:36 | 20 | could be terminated at any time with no reason because |
| 1:00:38 | 21 | she was a FCIP.  Documentation, formal procedure which |
| 1:00:42 | 22 | is normally required for all term Social Security |
| 1:00:46 | 23 | representative was not a requirement. |
| 1:00:49 | 24 | Q.    Do you remember if you asked them any |
| 1:00:51 | 25 | questions? |

*Overruled[12]*

*Objection: FRE 106, FRCP 32(a)(6), lines 53:4 to 53:13 should be included for completeness*

---

[12] Plaintiff must read the additional lines requested by Defendant.

```
1:18:01  1      Q.    And is it still your belief that everything
1:18:04  2   in it is accurate?
1:18:06  3      A.    Yes.
1:18:21  4      Q.    If you could turn to the third page of the
1:18:23  5   affidavit, paragraph No. 8.
1:18:31  6            It states, "On one occasion I watched
1:18:32  7   Kimberly and noticed that she was talking between 7:00
1:18:34  8   and 8:45 instead of working.  She went from desk to desk
1:18:38  9   and talked to people.  I spoke to her about it."
2:13:41 10            Do you remember that incident?
1:18:44 11      A.    Yes.
1:18:44 12      Q.    What happened that day?
1:18:46 13      A.    Again, I'm an early person.  I arrive at
  8:49 14   7:00, the same as Kimberly.  And again, like I said, I
1:18:51 15   was sitting close enough to their desk.  And it's very
1:18:53 16   important to me that between 7:00 and 8:45 my service
1:19:01 17   representatives are working.
1:19:02 18            Kimberly was bouncing, doing her usual.  She
1:19:04 19   was just like a little bumble -- exuberant little person
1:19:06 20   and just bouncing from desk to desk to desk talking,
1:19:10 21   just general conversation and not at her desk where she
1:19:16 22   needed to be.
1:19:17 23      Q.    Now, it says here in your affidavit, "I spoke
1:19:17 24   to her about it."
1:19:19 25            Do you recall speaking to Ms. Freeman about
```

*Handwritten annotation:* Objection: FRE 106, FRCP 32(a)(6), lines 59:18 to 59:22 should be included for completeness. Overruled[13]

---

[13] Plaintiff must read the additional lines requested by Defendant.

1:24:02 1    But I am taking the time ~~to talk~~ to you in a

1:24:06 2  private room, explaining ~~to~~ you what behavior you need

1:24:10 3  to modify. Whether you take that serious or not it's

1:24:14 4  kind of ridiculous. Yes it's serious and yes I did talk

1:24:17 5  ~~to her.~~

1:24:19 6    Q.    Did you feel that you were doing the best you

1:24:19 7  could to explain to her that there were problems with

1:24:23 8  her behavior and conduct?                    Overruled[14]

*objection: FRE 106, FRCP 32 (a)(6), lines 64:15 to 64:24 should be included for completeness.*

1:24:25 9    A.    Yes. Excuse me, yes. I'm not a dictator and

1:24:29 10  I don't want to be a dictator. I mean, I did not stand

1:24:31 11  up on a pedestal or down on a table and beat it into her

1:24:34 12  head. But I told her over and over and over again she

1:24:38 13  wasn't meeting my expectations. She had work to do.

1:24:44 14  Her desk was falling behind.

1:24:46 15    ~~There were things that were being delayed,~~

1:24:47 16  processing because she did the easy stuff. She wanted

1:24:49 17  the numbers. So if it was an easy input, she would do

1:24:51 18  it. But if it was a more difficult input it would sit.

1:24:55 19  She wouldn't ask me for help.

1:24:55 20    I'd go over to her desk and I would find

1:25:01 21  things that were aging, but they were more difficult

1:25:02 22  inputs. Because not every input could be input the same

1:25:04 23  day and cleared the same day. Sometimes it took

1:25:08 24  multiple inputs.

1:25:08 25    Q.    Can you give an example of something that you

---

[14] Plaintiff must read the additional lines requested by Defendant.

1:36:46  1    Sometimes somebody will send you in a month's worth of
1:36:49  2    wages that need to be done.
1:36:49  3           Or they'll send in something with a W-2 which
1:36:55  4    requires a 2.8 correction.  All of those things are
1:37:01  5    things that you'd learn as you go along that require a
1:37:04  6    large amount of time.  And she was just -- she had more
1:37:10  7    papers than I imagined she would have on her desk,
1:37:12  8    because again, she had a 50 percent workload.  And I was
1:37:16  9    just shocked with what I found.
1:37:17 10           Again, she never communicated with me.  If at
1:37:21 11    any point she would have told me, I'm falling behind on
1:37:23 12    my mail or I'm falling behind on transmitting Social
1   7:27 13    Security number applications or whatever, I don't ignore
1:37:31 14    that.
1:37:31 15           We deal with it which means I would have had
1:37:34 16    someone do it on their credit or we would have shared
1:37:36 17    the workload or I would have went to their mentor and
1:37:36 18    said, Could you help her get caught up on this backlog?
1:37:40 19    But Kimberly never came to me.  She never told me she
1:37:42 20    had problems.  She never asked me questions.
1:38:01 21       Q.    Were you aware of the fact that some African
1:38:02 22    American employees in your office had contacted the EEO
1:38:08 23    office with some concerns?
1:38:10 24    Objection: FRE 401, 403, 801, Defendant's Motion in Limine Nos. 2, 3.
              A.    Yes.  They told me themselves, I believe   Sustained
1:38:12 25    Linda Moore.  They have to ask me before they can talk

```
3:06:01  1        A.    Atleast.  Like I said, take that I was on the
3:06:04  2    training a lot.  But a dozen times would not be any
3:06:08  3    unreasonable number.
3:06:22  4        Q.    Now, if you go down to the last paragraph on
3:06:25  5    page 2 of Exhibit 4 -- actually, let me strike that.
3:06:30  6    Let me start at the top of page 2.
3:06:35  7            I note that there are dates for different
3:06:36  8    events.  On page 2 there's a June 4th date on the first
3:06:39  9    paragraph, June 5th on the second paragraph, June 18th
3:06:4310    on the third paragraph.  There's no date in the fourth
3:06:4711    paragraph and then the fifth paragraph has
3:06:4912    June 22nd, 2004.
3:06:5113            How was it in December of 2004 you were able
3:06:5514    to put precise dates for when things occurred?
3:06:5815        A.    I was instructed by Bobbie to start keeping
3:07:0216    memory joggers.  Because up to this point, like I said,
3:07:0417    the dismissal of Kimberly was never even thought about.
3:07:0618    She was a trainee; we were working with her.  But at the
3:07:1019    point that LMR had instructed us that we might want to
3:07:1520    pursue the dismissal, they recommended that I start
3:07:1621    keeping memory joggers.
3:07:1822        Q.    So in December 2004 when you prepared
3:07:2223    Exhibit 4 you still had those memory joggers?
3:07:2724        A.    Yes.
3:07:2725        Q.    And do you still have those?
```

Objection: FRE 401, 403, Defendant's Motion in Limine No. 5

Sustained

3:07:29 1          A.    No, I do not.

3:07:30 2          Q.    When did you get rid of those memory joggers?

Objection: FRE 401, 403, Defendant's Motion in Limine No. 5   Sustained

3:07:34 3          A.    After the initial appeal had been dismissed

3:07:37 4    or whatever the disposition was, Paula had told me that

3:07:42 5    we no longer needed to keep any information, that the

3:07:45 6    case was over.

3:07:47 7          At that point you've got to imagine I've got

3:07:49 8    folders and folders on my employees.  I didn't need to

3:07:53 9    keep miscellaneous ones on employees that I didn't have

3:07:54 10   any longer.  Because I did have an extensive file on

3:07:59 11   Kimberly.  But once Paula informed me that the complaint

3:08:02 12   was over, she gave me the authority to destroy

3:08:06 13   everything and that's what I did.

3:08:08 14         Q.    Now, are memory joggers generally something

3:08:09 15   that's considered part of Social Security system of

3:08:11 16   records?

3:08:12 17         A.    No, it is not.

3:08:13 18         Q.    Are those considered to be the supervisor's

3:08:17 19   personal files?

3:08:18 20         A.    Yes.

3:08:18 21         Q.    But at the time that you prepared Exhibit 4

3:08:21 22   in December of 2004, you did have those memory joggers

3:08:26 23   to refer to?

3:08:27 24         A.    Yes, I did.

3:08:28 25         Q.    And were the memory joggers written on or

BY MS. CORMIER:

16:05 1

16:40 2     Q.   Ms. Currey, could you please take a look at

16:42 3  Exhibit 6 and tell me if you know what it is.

16:48 4     A.   Yes.

16:14 5     Q.   What is it?

16:49 6     A.   As part of the training process we do a

16:55 7  midterm evaluation of how the class is going and how the

16:59 8  student is doing.  The tests that have been taken up to

17:02 9  that point are listed on the form.

17:04 10          Any comments, any suggestions are written

17:11 11  based on the questions that are asked, the program

17:14 12  knowledge and so forth.  A narrative is written and is

17 13  given to the trainee and discussed with the trainee

17:20 14  midway through the training class.

17:23 15     Q.   And I believe you said earlier when you

17:24 16  didn't have this document in from of you, that you did

17:24 17  have input into Ms. Freeman's midterm evaluation, but

17:30 18  you did not actually give it to her.

17:33 19          Is that correct?

17:33 20     A.   That is correct.  Anyone that is involved in

17:35 21  the training -- because there was some different

17:36 22  teachers sometimes teaching the classes which would have

17:39 23  inputs that others wouldn't.  The coordinator -- because

17:43 24  I have them during OJT.  Karen Courtney was the person

17:46 25  that was actually doing the majority of the training.

3:17:49  1          She too did not know all the topics, so we

3:17:52  2   had other people come in.  So anybody involved up to

3:17:53  3   this point would have some sort of input in regard to

3:17:58  4   the evaluation.

3:17:59  5          Q.   And if you could turn to the last page of

3:18:01  6   this exhibit.  And I just want to confirm that that's

3:18:13  7   not your signature on either of those lines.

3:18:14  8          Is that correct?

3:18:14  9          A.   That is correct.

3:18:15 10          Q.   One of the signature appears to be Kimberly

3:18:18 11   Freeman.

3:18:18 12          Would you agree with that?

3:18:19 13          A.   Yes.

3:18:19 14          Q.   And the evaluator's signature, can you tell

3:18:21 15   me whose signature that is?

3:18:22 16          A.   David Cornelius.

3:18:25 17          Q.   And he was in charge of the west Fresno

3:18:27 18   office.

3:18:27 19          Is that right?

3:18:28 20          A.   He was the manager of the west Fresno office.

3:18:30 21          Q.   And is that where the training -- the

3:18:40 22   classroom training took place?

3:18:40 23          A.   Yes.

3:18:40 24          Q.   I'd like to have you take a look at paragraph

3:18:40 25   5 of Exhibit 6.  It's a section entitled Interpersonal

3:19:51 1  effectively. You can use the telephone to complete your
3:19:53 2  follow-ups and request any proofs needed. You can
3:19:57 3  process your paperwork efficiently and still have
3:20:00 4  interaction with the public."
3:20:01 5       Did you agree with that narrative statement?
3:20:04 6  A.   Yes.
3:20:04 7       Q.   Did you agree that as of January of 2004 that
3:20:08 8  Ms. Freeman was working hard and striving for
3:20:11 9  perfection?
Objection: FRE 106, FRCP 32(a)(6), lines 9/0:2 to 16:14 + 97:5 to 97:16 should be included
3:20:13 10      A.   At this point she had only begun to learn for completeness.
3:20:15 11 things. I mean, they really hadn't at this point even Overruled
3:20:17 12 gotten into the meat of what a service representative
3:20:21 13 does. The first few tests are learning how to read the
3:20:23 14 POMS, learning how to read the queries. It wasn't the
3:20:26 15 actual processing of work. So at this point, yes.
3:20:31 16      Q.   And on the bottom of that page that you were
3:20:36 17 just looking at, there are some trainee comments that
3:20:38 18 Ms. Freeman added in. Did she provide those comments to
3:20:41 19 you?
3:20:45 20      A.   The discussion initially was between her and
3:20:48 21 David. And these were written, to my understanding. I
3:20:51 22 wasn't there at the time that David had the discussion
3:20:55 23 with her.
3:20:55 24      Q.   Did you receive a copy of her written
3:20:58 25 comments at any time?

| | | |
|---|---|---|
| 3:43:53 | 1 | And for the record what is your race? |
| 3:43:55 | 2 | A. Caucasian. |
| 3:43:58 | 3 | Q. And your age? |
| 3:44:00 | 4 | A. I'm 51 now. |
| 3:44:03 | 5 | Q. And the total number of years with the |
| 3:44:06 | 6 | federal government? |
| 3:44:07 | 7 | A. Twenty-seven. |
| 3:44:08 | 8 | Q. Were you eligible for retirement at the time |
| 3:44:11 | 9 | that you left your employment with the Social Security |
| 3:44:13 | 10 | Administration? |
| 3:44:15 | 11 | A. They offered early out. |
| 3:44:19 | 12 | Q. The question was were you eligible for full |
| 3:44:22 | 13 | retirement at the time of your retirement when you left |
| 3:44:25 | 14 | the Social Security Administration? |
| 3:44:28 | 15 | A. Full retirement? No, I had to take reduction |
| 3:44:31 | 16 | for age. |
| 3:44:38 | 17 | Q. And what was your performance appraisal at |
| 3:44:42 | 18 | the time of your last performance rating? |
| 3:44:45 | 19 | A. It's under the new packs, so it was just |
| 3:44:50 | 20 | successful I believe is the term that's used now. |
| 3:44:53 | 21 | Q. And your supervisor up until the time that |
| 3:44:58 | 22 | you retired or took early retirement? |
| 3:45:01 | 23 | A. Ousanna Kachian. |
| 3:45:04 | 24 | Q. And were you given praise in your |
| 3:45:09 | 25 | retirement -- in your performance evaluation by Ousanna? |

```
3:45:14  1        A.    I was rated with two fives and three threes.
3:45:21  2        Q.    And what were the threes in?
3:45:24  3        A.    I didn't keep a copy.  Like I said, she sent
3:45:27  4   it to me when I was at my daughter's and she required it
3:45:30  5   back.  I simply signed it and returned it.  At this
3:45:31  6   point I was retired.  I really didn't take note.
3:45:39  7        Q.    Did you consider the comments that were made
3:45:42  8   in your performance appraisal to be negative?
3:45:46  9        A.    She had some opinions that she stated that,
3:45:50 10   you know, that were opinions and she had the right to
3:45:55 11   make them.  She was my supervisor.  So there were some
3:45:58 12   things that perhaps I would not have liked, but that she
3:46:01 13   is my supervisor.
3:46:06 14        Q.    Was her treatment of you a factor in retiring
3:46:10 15   when you did?
3:46:11 16        A.    No.  My daughter lives in Mississippi and
3:46:17 17   it's such a long way away from her mother.  She got
3:46:20 18   pregnant just about the same time the early out was
3:46:22 19   offered.  I do not financially need to work, so I chose
3:46:27 20   retirement.
3:46:35 21        Q.    Did you recently get an award from the Social
3:46:38 22   Security Administration?
3:46:39 23        A.    I just found out last week that I was
3:46:42 24   nominated for the Deputy Commissioner Citation, the
3:46:47 25   second highest award within Social Security.
```

*Objection: Lacks foundation as excerpted; FRE 106, FRCP 32(a)(6) lines 111:17 to 112:6 Should be included for completeness. Overruled[15]*

*Objection: FRE 401, 403 Overruled*

[15] Plaintiff must read the additional lines requested by Defendant.

1  Q.  And how much money is involved in that award?

*Objection: FRE 401 + 403* Sustained

2  A.  I wish I knew. I haven't even -- I had to go

3  to work to actually get them to print out the E-mail

4  that stated I got it. I know nothing about the award,

5  whether it considers a plaque, money. If you know

6  anything, I'd like to know what that is. But I know

7  nothing.

8  Q.  And when you went to work, do you recall what

9  day that was?

10  A.  It was last week. Let's see, what day was

11  that? I think it was Tuesday, but my life's been kind

12  of crazy right now.

13  Q.  What procedures were used to get you into the

14  building?

15  A.  I came through the front door as everyone, I

16  signed in with the guard. There was a new guard there.

17  He did recognize us as former Social Security employees,

18  so he opened up the door for us.

19  Q.  So you were allowed to come into the offices

20  as if you were still working for the Social Security

21  Administration?

22  A.  No. I was not allowed to come in through the

23  door even though my combination probably still works. I

24  was required to come in through like the public, come in

25  through the front doors. I signed in. There's a

3:55:07 1    week, through the month.

3:55:08 2        Q.   Right.

3:55:08 3        A.   Starting next month that's tape one to get

3:55:09 4    the backload for that week so there was no like 100,000

3:55:14 5    tapes.  It was just five days of the week and five

3:55:16 6    Fridays in the month.  And each was a number, so the

3:55:20 7    first Friday in November would be used the first Friday

3:55:23 8    in December.

3:55:24 9        Q.   So there was a deliberate system of

3:55:27 10   overriding all of the evidence every month?

3:54:57 11       MS. CORMIER:  I object that that's argumentative as

3:55:34 12   stated.  But go ahead.

3 5:02 13        THE WITNESS:  I mean, I don't know -- like I said

3:55:36 14   again how the computer system works.  That's just -- our

3:55:40 15   instruction was to change the tape and that's what we

3:55:42 16   did.

3:55:42 17   BY MS. DRYOVAGE:

3:55:44 18       Q.   Okay.

3:55:46 19            Now, you were the person in charge of

3:55:52 20   supervising the trainees during the initial few months

3:55:57 21   in which they were being trained in the other office?

3:56:01 22       A.   Karen Courtney was the supervisor in the west

3:56:04 23   office.  She was the teacher for the class while they

3:56:08 24   were there.  I was coordinator, which meant I was the

3 6:11 25   one that was responsible for working with the training

```
3:56:15  1   region.  The trainees were mine when they were back on
3:56:16  2   OJT.
3:56:17  3             Because part of the on-the-job training was
3:56:19  4   like they had two weeks, you know, once a month to go
3:56:22  5   come back to the office of duty and at that point I was
3:56:26  6   supervising them.  But as far as while they were in
3:56:28  7   class, their immediate supervisor was Karen Courtney.
3:56:33  8        Q.   During the period that Kimberly Freeman was
3:56:36  9   being trained, did you take any notes concerning any
3:56:40 10   conduct that you observed?
             Objection: FLE 106, FLCP 32(a)(b) lines 119:19 to 120:7 should be included
3:56:42 11        A.   Notes?  Not that I remember, no. for completeness  Overruled
3:56:51 12        Q.   Now, do you recall any conversations that you
3:56:53 13   had with Ms. Summers regarding Ms. Freeman during that
  56:58 14   initial training stage?
3:57:00 15        A.   Part of the office policy was that we would
3:57:03 16   meet with Bobbie and discuss how the trainees were
3:57:10 17   doing.  She would talk maybe to David.  There were
3:57:12 18   different times where anyone that was working with the
3:57:14 19   class Bobbie would keep informed as to how the class was
3:57:25 20   going.
3:57:25 21             At that point I don't remember what ritual we
3:57:25 22   did.  I know towards the end we were doing it on a
3:57:25 23   weekly basis, but at that point I couldn't tell you how
3:57:27 24   often.  But I'm sure it was probably atleast weekly that
3:57:32 25   we would meet with Bobbie and she would talk about how
```

| | |
|---|---|
| 4:19:11 1 | Q. And are the 7-B files destroyed at any point? |
| 4:19:16 2 | A. They are destroyed at a certain point after a |
| 4:19:21 3 | person leaves the agency. I think it's 45 days or |
| 4:19:24 4 | something. And then the other 7Bs are kept in there. |
| 4:19:28 5 | But at the end of every year or within two |
| 4:19:29 6 | years -- because the 7-B files get too full we do purge |
| 4:19:33 7 | them. But by purging them we give everything in the 7-B |
| 4:19:35 8 | file to the employee for them to dispose of in whatever |
| 4:19:39 9 | fashion they choose. |
| 4:19:42 10 | Q. Do you recall giving the final evaluation to |
| 4:19:47 11 | Kimberly Freeman at any point? |
| 4:19:49 12 | A. Like I said, I cannot physically sit here and |
| 4:19:52 13 | remember bits and pieces of my memory. Say I remember |
| 4:19:57 14 | discussing it, but it's so vague at this point I -- |
| 4:20:00 15 | there seems to be a question. Kimberly and Teresa |
| 4:20:07 16 | should both have a copy of it. If they don't then I'm |
| 4:20:10 17 | not sure what happened. |
| 4:20:12 18 | Q. As you sit here today do you recall whether |
| 4:20:16 19 | Kimberly Freeman got high marks on her test scores? |
| 4:20:21 20 | A. I can't remember that either. |
| 4:20:24 21 | Q. Would you recall if she had flunked the test? |
| 4:20:27 22 | A. If she had failed, it would have been |
| 4:20:28 23 | something that would have stuck in my memory. There was |
| 4:20:33 24 | only a few people that failed in the training class. |
| 4:20:34 25 | Kimberly wasn't one of them. |

Objection: FRE 106, FRCP 32(a)(6) lines 139:1 to 139:8
should be included for completeness. Overruled

4:20:34 1     You know, most people -- because the training

4:20:34 2 class is just the basic, it's just the beginning point

4:20:37 3 of training.  It's not meant for anyone to fail.  It's

4:20:39 4 just meant for someone to get a starting point in

4:20:43 5 learning the job.

4:20:44 6     And it's pretty much basic information and

4:20:46 7 out of the whole time I've been there, maybe one, two

4:20:49 8 people at the most ever failed a class.

4:20:52 9   Q. So it's quite likely that the final

4:20:56 10 evaluation form would have given high marks to Kimberly

4:21:00 11 Freeman.  Correct?

4:21:01 12   A. Well, the actual form itself needed

4:21:04 13 improvement or was adequate.  It doesn't give you a

4:21:07 14 whole lot of leeway to say anything other than -- it's

4:21:10 15 just a -- to say that you passed the course, that you

4:21:13 16 did do well for the scores.  I don't think that it

4:21:16 17 allows you to put outstanding.

4:21:18 18     I mean, you can put any remark that you

4:21:19 19 wanted.  But as far as actually grading, that's not what

4:21:22 20 that's about.  You did learn what was given to you

4:21:26 21 during the class and you did pass the test.

4:21:30 22   Q. And it would be a violation of the agency's

4:21:33 23 rules to not provide her with a copy of the final

4:21:37 24 evaluation form?

4:21:37 25   A. Yes.  It was a requirement to have it done,

4:26:57 1        Q.    So do you recall having any conversations

4:27:00 2    with Kimberly Freeman in which you save her instructions

4:27:03 3    that she could only talk to her mentor?

4:27:07 4        A.    My instructions to her would have been, Go to

4:27:10 5    your mentors first and to me because I want you to have

4:27:13 6    the same information given to you more than once and

4:27:16 7    accurate and complete information.  That would have been

4:27:19 8    a basis of what I would have said.  But no, I would not

4:27:21 9    have pinpointed anybody's name.  Don't go see this

4:27:25 10   person, don't go see that person.

4:27:31 11       Q.    I didn't ask you about pinpointing anybody's

4:27:35 12   name.

7:36 13          Did you tell Kimberly Freeman that she could

4:27:38 14   not talk to anyone besides her mentor?

4:27:41 15       A.    No.  Not the word talking to, no.

4:27:44 16       Q.    Well, what words did you use?

4:27:47 17       A.    I told her when she had her questions in

4:27:48 18   regard to her workload, she needed to go to her mentors

4:27:51 19   first and then to me.  All the other employees had

4:27:54 20   full-time workloads and did not have the availability of

4:27:57 21   time to help them to the detail they needed to be.

4:28:02 22   Those would have been my directions to her.

4:28:06 23       Q.    And did you give her any specific

4:28:09 24   instructions about who she could not ask questions of

4:28:12 25   regarding her workload?

*Objection: FRE 106, FRCP 32(a)(6), lines 143:11 to 144:2*
*should be included for completeness*  Overruled[16]

[16] Plaintiff must read the additional lines requested by Defendant.

4:28:14 1     A.   I do not remember making any kind of
4:28:17 2  statement like that.

4:28:18 3     Q.   Do you recall chastising her for asking
4:28:21 4  questions of people other than her mentor or yourself?

4:28:25 5     A.   Yes, I do.

4:28:26 6     Q.   And how many occasions did you chastise her
4:28:28 7  for that?

4:28:28 8     A.   The one time, like I said, that I was talking
4:28:30 9  about was the time that she was talking with Francis.
4:28:35 10  That was a major incident to me because I was working
4:28:35 11  with Francis on her own workload and was very upset that
4:28:39 12  she had taken Francis away from her adjudication.

4:28:42 13     That's the only incident that stands out in
4:28:45 14  my mind very vividly.  That was very noticeable because
4:28:50 15  first of all the amount of time that she spent with
4:28:53 16  Francis and the amount of time that Francis was not
4:28:54 17  allowed to work on her own work -- and I was at my desk
4:28:57 18  and was available for her to ask me any questions.

4:29:04 19     Q.   And you said that Francis had health
4:29:09 20  problems.

4:29:09 21     Do you recall what those were?

4:29:11 22     A.   She was a severe diabetic.  And she was going
:29:16 23  through issues with her husband and she had personal
:29:19 24  issues.  Francis finally did go off on disability.  She
:29:24 25  has left the agency now due to a disability.

```
4:42:52  1   incident in which you said that Kimberly Freeman used an
4:42:58  2   override and that she was told by someone not her mentor
4:43:03  3   to use the shortcut.
4:43:06  4              Do you recall who told her about the
4:43:08  5   shortcut?
4:43:10  6        A.    I don't remember.  I can vaguely -- and I
4:43:14  7   could throw out a name, but I'm not quite sure.  I just
4:43:17  8   remember that it was not her mentor because when she
4:43:20  9   told me and was giving the excuse of I was told to do
4:43:21 10   it, when it wasn't her mentor, that's what sticks in my
4:43:27 11   memory.
4:43:31 12              Because she was instructed to get her
   3:34  13   directions from her mentor or from me.  So when she was
   .3:35 14   given misinformation, that was what my concern was.
4:43:39 15   Because that's what I tried to prevent was her getting
4:43:43 16   misinformation by going to other sources.
4:43:46 17        Q.    And was the use of the override such a
4:43:51 18   serious event that you made a note of it?
4:43:54 19        A.    What it was was she was overriding a notice,
4:43:57 20   which meant the person did not get their due process.
4:44:00 21   Again, it was a failure to allow a person to have their
4:44:04 22   legal rights.
4:44:05 23              Yes, to me that is a very serious issue
4:44:08 24   Because if I was getting an action taken to suspend my
4:44:11 25   benefit and I didn't get the appropriate notice and
```

Objection: FRE 106, FRCP 32(a)(b), lines 151:23 to 152:2 should be included for completeness

Overruled[17]

---

[17] Plaintiff must read the additional lines requested by Defendant.

4:44:14 1  didn't know about it until after it had happened, it

4:44:18 2  would be very upsetting to me.

4:44:19 3       Q.   And did you find out about this on the day

4:44:22 4  that she did it?

4:44:23 5       A.   No.  I don't remember exactly how I found out

4:44:26 6  or whether I was reviewing an input form that she showed

4:44:28 7  me because it was a manual input, it wasn't the regular

4:44:30 8  MSSICS input.  It was a 1719-B where she actually had to

4:44:36 9  fill out the fields.  And I don't know whether I saw the

4:44:39 10  actual hard copy of the input or the input form itself.

4:44:42 11       But when I saw that she had overrode the

4:44:44 12  notice field by putting zeroes in it, I ask her, Why did

4:  4:52 13  you override this notice field?  And she could not tell

4:44:52 14  me why.  She just said someone had told her to do so.

4:44:52 15  The action processed the claim into suspension, but it

4:44:55 16  did not give the person the proper notice form,

4:44:59 17  therefore not allowing them to have their rights.

4:45:03 18       Q.   And was this subsequently corrected and the

4:45:08 19  due process notice was sent to the claimant?

4:45:11 20       A.   After they were already suspended, you can't

4:45:13 21  unsuspend them to suspend them again.  So no.

4:45:22 22       Q.   And was this such a serious incident that you

4:45:27 23  took note of it and physically wrote it down someplace?

4:45:30 24       A.   No.  I would not have physically wrote it

4  5:33 25  down.  It was just an accumulation of things.  Certain

| | |
|---|---|
| 4:46:55 1 | Q. Was this such a serious incident that you |
| 4:46:57 2 | would have noted it in her 7-B file? |
| 4:46:26 3 | A. Oh, no. Like I said, at this point nothing |
| 4:47:01 4 | was put into Kimberly's 7-B file. |
| 4:47:18 5 | ~~Q. Now, you said that there were certain notes~~ |
| 4:47:23 6 | that you did take concerning Kimberly Freeman's conduct |
| 1:47:26 7 | before she was fired. |
| 1:47:29 8 | Do you recall saying that? |
| 1:47:30 9 | A. Yes. |
| 1:47:3 10 | Q. And you were told by Paula Singer to destroy |
| 1:47:35 11 | those documents? |
| 1:47:38 12 | A. Basically. Not those specific documents. My |
| 1 .:40 13 | question to Paula was do I need to keep anything that |
| , 47:42 14 | I've had on Kimberly now that Kimberly has left the |
| 1:47:44 15 | agency? And the appeal is no longer pending because I |
| 1:47:49 16 | need room in my desk. And at that point I was given |
| 1:47:52 17 | instruction that I didn't need to keep anything on |
| 1:47:54 18 | Kimberly, therefore it was my own action. I did destroy |
| 1:47:58 19 | everything. |
| 1:48:02 20 | ~~Q. Okay.~~ |
| 1:48:03 21 | So you're saying that Paula Singer did not |
| 1:48:07 22 | instruct you that you could destroy the records |
| 1:48:09 23 | concerning Kimberly Freeman's performance? |
| 1:48:13 24 | A. She -- as far as instructing me, she told me |
| 1 .9:16 25 | I could -- didn't have to keep the information I had on |

*Objection: FRE 401, 403, Defendant's Motion in Limine No. 5* Sustained

4:51:20 1    Q.    So when you testified earlier that there was
4:51:23 2  a lady that came in with a check, that's not accurate?
4:51:28 3    A.    If I put a sex to bringing in the check,
4:51:30 4  yeah, it would have been just a misspoke.  I do not know
4:51:33 5  if it was a lady or a man.
4:51:50 6    Q.    Now, you said that you assisted Francis
4:51:54 7  Hopson in filing for disability retirement?
4:51:58 8    A.    Yes.
4:51:58 9    Q.    How many years had she worked at Social
4:52:02 10 Security Administration when she went out on disability
4:52:02 11 and retirement?
4:52:03 12   A.    She had about the same amount of years that I
4:52:05 13 had.  I think about 26, 27 years.
4:52:15 14   Q.    And were there steps being taken to fire her
4:52:15 15 for performance reasons at that time?
4:52:16 16   A.    No.
4:52:20 17   Q.    Do you recall having any discussions with
4:52:22 18 Paula Singer about firing Francis Hopson?
4:52:26 19   Objection: FRE 401, 403, 801, Defendant's motion in limine Nos. 2+3   Sustained
         A.    We had not got to that point.  We were
4:52:29 20 working with the Magic Machine and still trying to work
4:52:32 21 with her giving her a lot of time.  It might have
4:52:38 22 progressed to that, but we were certainly not there at
4:52:43 23 the point that she filed for the retirement.
4:52:45 24   Q.    And how many years did she have before she
4:52:48 25 was eligible for regular retirement?

Objection: FRE 401, 403, 602   Sustained

4:52:51 1        A.    I think she had the same as me.    Thirty and

4:52:54 2   age 55.

4:52:56 3        Q.    And so she was atleast four years away?

4:53:00 4   Objection: FRE 401, 403, 602 — Sustained    A.    Yeah, probably.

4:53:03 5        Q.    ~~If she had been provided reasonable~~

4:53:06 6   accommodation earlier on, would she had more likely to

4:53:11 7   not lose her eyesight that required her to go off on

4:53:12 8   disability requirement?

4:53:13 9        MS. CORMIER:    Objection.    Calls for an expert

4:53:16 10  opinion.

4:53:19 11       MS. DRYOVAGE:    You can answer.

4:53:21 12       THE WITNESS:    I have no idea.    In fact, I was the

4:53:22 13  one that encouraged Francis to even ask when I was

4:53:24 14  realizing she couldn't see.    Francis again, like I said,

4:53:26 15  is very pride.    We didn't even know.    Linda didn't even

4:53:28 16  know how bad her -- she had got her sugar to 600.

4:53:32 17       She had -- like I said, she was having health

4:53:33 18  issues, marital problems.    Her sugar was up over 600 for

4:53:36 19  an extended period of time before anyone knew it.    We

4:53:40 20  didn't know how bad she was until the sugar effected her

4:53:42 21  eyesight.

4:53:43 22       And at that point when I saw she was

4:53:45 23  struggling, I was the one that said we need to seek you

4:53:48 24  accommodations.    Let's see what we can do.    And finally,

4:53:50 25  after speaking to her for months, she finally agreed.

```
4:59:24  1 | of problems with Kimberly Freeman's work performance
4:59:36  2 | except for the midyear performance evaluation?
4:59:36  3 |      A.    Right.  As a trainee it wasn't required that
4:59:36  4 | we keep any documentation because she was in trainee
4:59:37  5 | status.  And we weren't documenting any trainee at that
4:59:42  6 | point.
4:59:43  7 |      Q.    And do you recall at what point you received
4:59:48  8 | notice from Linda that she needed to talk to the union
4:59:52  9 | about the racial harassment in the office?
4:59:53 10 |      A.    I don't remember the exact dates because it
4:59:55 11 | was just a matter of her coming and saying, On this
4:59:58 12 | certain date I need some time to talk to someone.  And I
00:01  13 | just had to look at the schedule and say, Okay, I can
00:03  14 | look at it to see if you can have this amount of time.
5:00:04 15 | But I don't remember the dates.
5:00:08 16 |      Q.    Does May of 2004 strike a bell?
5:00:11 17 |      A.    I couldn't tell you.
5:00:14 18 |      Q.    Well, do you recall learning of the fact that
5:00:20 19 | she was going to the union to discuss filing of
5:00:24 20 | complaint?
5:00:25 21 |      A.    Prior to May?
5:00:26 22 |      Q.    Yes.
5:00:28 23 |      A.    Again, I don't remember the dates.  My
5:00:30 24 | unit -- my unit was very disgruntled about a lot of
5:00:38 25 | things when I first got there.  And I was working, you
```

Objection: FRE 401, 403, 801, Defendant's Motion in Limine No. 2 Sustained

Objection: FRE 401, 903 Defendant's Motion in Limine No. 2 Sustained

CENTRAL VALLEY REPORTERS                    163
Fresno, CA  (559) 224-5511

| | | |
|---|---|---|
| 5:00:40 | 1 | know, to resolve some of their issues the best I could. |
| 5:00:43 | 2 | So I knew there was issues going on. |
| 5:00:46 | 3 | To what extent, I never got involved. It was |
| 5:00:49 | 4 | none of my business. I only got involved when my |
| 5:00:50 | 5 | employees told me what was going on and that they needed |
| 5:00:55 | 6 | time from their desks. The exact times and dates -- I |
| 5:01:00 | 7 | tried to stay out of the offices issues. |
| 5:01:01 | 8 | Q. Were you aware that a grievance was filed by |
| 5:01:05 | 9 | Kimberly Freeman's mentor because she was not getting |
| 5:01:09 | 10 | promotional opportunity that she requested? |
| 5:01:13 | 11 | A. I knew -- I thought Sandra had done |
| 5:01:15 | 12 | something. But for what reason, no, I wasn't aware. |
| 1:19 | 13 | But I believe Sandra had said something to me about some |
| 5:01:24 | 14 | issues, but again, she wasn't directing it at me. She |
| 5:01:31 | 15 | wasn't asking me to be involved. So what they said to |
| 5:01:33 | 16 | me was private and kept there. I don't remember the |
| 5:01:37 | 17 | details. |
| 5:01:38 | 18 | Q. Well, who -- |
| 5:01:43 | 19 | Which other employees that you supervise |
| 5:01:48 | 20 | requested time to talk to the union about the racial |
| 5:01:50 | 21 | harassment? |
| 5:01:51 | 22 | MS. CORMIER: Objection. Assumes facts not in |
| 5:01:53 | 23 | evidence. |
| 5:01:56 | 24 | THE WITNESS: Anyone that asked me. And at this |
| 5:01:58 | 25 | point I believe Francis had asked me; Teresa had asked |

*Objection: FRE 401, 403, 602, Defendant's Motion in Limine No. 2 Sustained*

```
5:10:38  1        Q.    Yes.
5:10:38  2        A.    Why would I be upset about that?  That was
5:10:41  3   great that they would have a baby shower for another
5:10:43  4   employee.  I don't get involved in things like that.
5:10:47  5        Q.    Do you recall expressing your displeasure
5:10:49  6   when you weren't invited to the shower?
5:10:53  7        A.    No, not at all.  I did not socialize with my
5:10:57  8   employees.
5:11:34  9        Q.    Back to Exhibit 1, the affidavit that you
                                   (Trial Ex. 50)
5:11:37 10   signed on June 30th, 2005.
5:11:45 11              At this point did you have any documents that
5:11:49 12   you referred to in answering the questions that were put
1:53    13   to you by the EEO investigator?
            Objection: FRE 401, 403, Defendant's Motion in Limine No. 5 Overruled
5:12:11 14        A.    I'm not referencing any dates or numerics in
5:12:14 15   here, so I would assume it was simply asking questions
5:12:18 16   based on memory.  Because had I noted numbers or dates
5:12:24 17   that I would have -- might have been referencing
5:12:27 18   something.  But at this point there's no dates or
5:12:30 19   numbers, so I would have to say no.
5:12:35 20        Q.    And at that --
5:12:37 21              At the point that you gave that statement
5:12:39 22   which is signed June 30th, 2005, had you actual
5:12:45 23   incidents of issues concerning Kimberly's performance
5:12:52 24   that existed?
5:12:58 25        MS. CORMIER:  Objection.  Vague.
```

BY MS. DRYOVAGE:

5:21:47 1

5:21:47 2    Q.    And who in LMR were you dealing with at the

5:21:50 3    time?

5:21:51 4    A.    Again, I didn't make the phone calls, so it

5:21:52 5    wasn't a name that I noted.  It was Bobbie calling

5:21:55 6    somebody on the phone and just speaking to them.  And I

5:21:59 7    do not know who she was dealing with.

5:22:01 8    Q.    And were you present during any of the

5:22:05 9    conversations?

5:22:06 10   A.    The very first one I know I was.  Because at

5:22:09 11   that point when it was brought up, she said, Let's sit

5:22:11 12   right here and let's call LMR to find out what we can

7 2:13 13    and cannot do in this situation.

5:22:16 14         So I was present for that conversation.  How

5:22:19 15   ~~many other ones, I~~ couldn't tell you.

5:22:21 16   Q.    Did LMR during that first conversation in

5:22:24 17   which you were present tell you to preserve the

5:22:28 18   documentation of the basis for terminating Ms. Freeman?

5:22:31 19   *Objection: FRE 401, 403, 801, Defendant's Motion in Limine No. 5  Sustained*

A.    No.

5:22:32 20   ~~Q.    And did they give you any instructions~~

5:22:40 21   regarding destroying the evidence upon which the

:22:40 22   termination be based on?

:22:40 23   A.    No.

:22:42 24   Q.    Did you ever provide copies of any of the

:22:42 25   alleged documentation that would establish a basis for

| | |
|---|---|
| 5:22:46 1 | terminating Kim Freeman to the LMR individuals? |
| 5:22:54 2 | A. No. |
| 5:23:02 3 | Q. Now, you said that there was a request made |
| 5:23:04 4 | by you to Ms. Galan and Ms. Freeman to keep copies of |
| 5:23:16 5 | documents in a file? |
| 5:23:17 6 | A. Yes. As a trainee you needed 100 percent |
| 5:23:22 7 | review so I could make sure that your -- you were taking |
| 5:23:22 8 | appropriate action. So any action that you had taken to |
| 5:23:24 9 | input during that week -- be it change of address, be it |
| 5:23:30 10 | direct deposit -- I needed you to keep a copy of it in a |
| 5:23:34 11 | folder so at the end of the week I could review the |
| 5:23:39 12 | record and determine that the information that I had |
| 5:23:42 13 | matched up with the record to make sure that your inputs |
| 5:23:45 14 | were correct. |
| 5:23:46 15 | Because at this point, every input they were |
| 5:23:49 16 | doing might have been the very first time they did the |
| 5:23:49 17 | input. I needed to know if they could do it accurately |
| 5:23:52 18 | so I could catch it right then so the next one they did |
| 5:23:54 19 | would be accurate. |
| 5:23:56 20 | Q. Now, you testified earlier that Kim Freeman |
| 5:24:04 21 | was asked to keep a file and she refused to keep a file? |
| 5:24:13 22 | A. Refusal is a harsh word with Kim. Kim never |
| 5:24:13 23 | blatantly told me no to anything. That wasn't Kim's |
| 5:24:14 24 | style. Kim just never took me seriously. As her |
| 5:24:17 25 | supervisor, I don't know -- I don't know how many jobs |

5:24:21 1  she had before, what her working relationships were.

5:24:25 2  But Social Security has so many rules and

5:24:27 3  regulations and when your supervisor gives you a

5:24:31 4  directive, most people follow it. Kim -- it wasn't a

5:24:34 5  blatant action by her not to do it, it's just -- she

5:24:35 6  just didn't do it. And when I remind her again she

5:24:40 7  still didn't do it.

5:24:42 8  Q. And in what month did you first ask her to

5:24:47 9  provide this information on a weekly basis to you?

5:24:51 10  A. As soon as she got back -- as soon as her

5:24:52 11  class was finished, they immediately got a 50 percent

5:24:55 12  workload and started interviewing. At that point I

:  4:58 13  needed to review her inputs because she was fresh out of

5.25:02 14  class, was working, may be doing inputs for the very

5:25:06 15  first time.

5:25:06 16  I wanted to make sure that she understood how

5:25:09 17  to do a rep payee, how to do a 2.8, how to do a DACUS.

5:25:12 18  The first time -- if I review what she did and say she

5:25:14 19  knows what she's doing, then we can move to something

5:25:17 20  else. But I needed to see those very first inputs to

5:25:20 21  know if there was an issue that I needed to train her

5:25:24 22  on.

5:25:25 23  Q. What month was that?

5:25:26 24  A. She got out of class, what, in March? So it

5. 5:29 25  had to start with the month she was out. So it had to

5:25:36  1  ~~be March.~~

5:25:37  2      Q.    And did you document her refusal to follow

5:25:46  3  your direct order?

5:25:47  4  *Objection: FRE 106, FRCP 32(a)(6), (lines 179:20 to 180:7 should be included for completeness*   A.    No.   Overruled[18]

5:25:50  5      Q.    Was there any errors in her work brought to

5:25:53  6  your attention prior to conversations that you had with

5:25:57  7  Ms. Summers about terminating her?

5:25:28  8      A.    As with all -- excuse me. As with all

5:26:04  9  trainees, when repeat business comes in and they'll say,

5:26:06 10  Well, I talked to so and so, the service reps might come

5:26:08 11  to me and say, Well, Kim talked to this person and this

5:26:11 12  wasn't done. And that's just typical for my unit.

6:15 13      So yes, there were times -- but that's just

5:26:16 14  trainees, which I'm not worried about that. That wasn't

5:26:19 15  the issue because I expected you to make mistakes. But,

5:26:22 16  you know, I expected you to correct your mistakes and to

5:26:26 17  not make them again.

5:26:28 18      Q.    Well, the question is as you sit here today

5:26:31 19  do you recall a single mistake that Kim Freeman made

5:26:35 20  that came to your attention during this period from

5:26:36 21  March to May?

:26:39 22      A.    I listed the ones that I was aware of -- a

:26:44 23  payee application or B3s. The ones that the employees

:26:50 24  notified me of, I can't -- those were dealt with at the

:26:54 25  time and went on.

---

[18] Plaintiff must read the additional lines requested by Defendant.

Objection: FRE 106, FRCP 32(a)(6), lines 182:1 to 182:6 should be included for completeness

5:26:58 1    But the ones that I actually located the Overruled[19]

5:27:01 2  documents myself, those I could remember. Because I

5:27:06 3  remember payee applications very -- and I remember payee

5:27:10 4  accounting. That was a similar error. And I remember,

5:27:13 5  like I said, the B3s. Certain issues that were large

5:27:16 6  issues I remember specifics about.

5:27:20 7       Q.   Did you get any instructions from Paula

5:27:23 8  Singer or Bobbie Summers to maintain the documentation

5:27:29 9  to establish that Kim Freeman actually made a mistake?

5:27:35 10       A.   No.   I had the documentation strictly because

5:27:35 11  it was kept for ROC purposes down the road.   I wasn't

5:27:41 12  given directions one way or the other.   It was just

7:43 13  policy and procedure that you kept stats even on new

5:27:47 14  people, you know, just in case they did get a ROC.

5:27:49 15       If Kim had succeeded and continued, maybe by

5:27:52 16  the end of the year and be successful, she might have

5:27:54 17  been eligible for a ROC.   I wouldn't have known that if

5:27:57 18  I hadn't kept data on her.   So things that came across

5:27:59 19  my desk like that I did have in a folder for Kim.

5:28:02 20       Q.   And no copies were given to Paula Singer or

5:28:07 21  Bobbie Summers of any of that documentation?

5:28:11 22       A.   No.

5:28:16 23       Q.   Were you Noel Riggins' direct supervisor?

5:28:20 24       A.   While he was in the office, yes.

5:28:22 25       Q.   And did you have occasion to talk to him

[19] Plaintiff must read the additional lines requested by Defendant.

5:29:47 1    Q.    Do you recall in May 2004 Noel Riggins asking

5:29:49 2  to have time to file an EEO complaint?

5:29:52 3  Objection: FRE 401, 403, 801, Defendant's Motion in Limine No. 2   A.    Specifically, no, I can't remember.    Overruled

5:29:55 4    Q.    And did you inform Paula Singer that he was

5:30:01 5  filing an EEO complaint concerning her treatment of him

5:30:06 6  or mistreatment of him?

5:29:33 7    A.    What -- I don't even remember the

5:30:10 8  conversation, so I don't know why I would talk to Paula.

5:30:15 9  I can't even remember him -- I don't -- Noel would

5:30:15 10  never -- he's one person that wouldn't actually tell me

5:30:17 11  it was an EEO.  He would just tell me he wanted to talk

5:30:19 12  to a union rep.

:0:22 13           I can't imagine -- Noel was much more private

5.30:24 14  than that.  I can't imagine him telling me right out

5:30:27 15  that he was filing an EEO.  But I don't remember.  But

5:30:28 16  if his own personality would have been, Vicky, I need to

5:30:34 17  talk to the union rep and that would have been it.  And

5:30:37 18  I would have designated him time.

5:30:39 19    Q.    And did you ever observe Kimberly Freeman

5:30:41 20  talking to Noel Riggins during work time?

5:30:45 21    A.    Kimberly talked to all of the employees.

5:30:47 22  That was Kimberly.  Kimberly never didn't talk to them.

5:30:50 23  So yeah, she talked to all the service reps during

5:30:55 24  office hours.

5:30:55 25    Q.    And do you recall observing her asking

5:34:18 1      Q.   So Social Security Administration does not

5:34:21 2  keep documentation concerning delayed workload?

5:34:24 3      A.   I do not have such documentation myself.  I

5:34:28 4  cannot speak for the whole agency.

5:34:32 5      Q.   And the documentation that was on Kimberly

5:34:36 6  Freeman's desk after she was terminated, that was all

5:34:40 7  destroyed?

*Objection: FRE 401, 403, Defendant's Motion in Limine No. 5*    Sustained

5:34:40 8      A.   Yes.  I actually at the time had copied every

5:34:43 9  document -- every piece of paper on her desk.  I can't

5:34:47 10  believe I had a file this big.  I regret getting rid of

5:34:50 11  it, but it was taking a lot of space on my desk.  And

5:34:55 12  after I state -- after we were told that this was done,

'4:57 13  over with, it was finished, the entire file was

5.35:01 14  destroyed.

5:35:03 15      Q.   And was there anybody that you talked to

5:35:07 16  before making the decision to destroy that file other

5:35:12 17  than Paula Singer?

5:35:14 18      A.   No.  It was simply Paula after she had her

5:35:17 19  final notification from the EEO Board that it was done.

5:35:22 20  And at that point it was her grievance, her issue.  I

.5:35:27 21  simply stated I've got so many files over here, do I

.5:35:31 22  need to keep this anymore?

.5:35:34 23      Q.   Now, regarding the events that occurred on

.5:35:38 24  July 9th, 2004, the date that Ms. Freeman was given the

15:35:41 25  termination of appointment, do you recall reporting to

5:36:52 1     A.    I never received any messages on my phone at
5:36:56 2   work.  I never was told by anyone, employee or anyone,
5:36:59 3   that she had requested to talk to me.  My understanding
5:37:04 4   was after she left -- I don't even know if Bobbie talked
5:37:11 5   to her.  But no one told me at all that she was wanting
5:37:12 6   to talk to me after she left.
5:37:14 7     Q.    Now, would you have talked to her if she had
5:37:19 8   called up?
5:37:20 9     A.    That I don't know at this time.  I would
5:37:21 10  have -- whatever LMR had recommended.  Because again,
5:37:25 11  this was -- we were taking our directions from LMR.  So
5:37:29 12  today to make a statement one way or the other, I do not
37:29 13    know.  I do not know what LMR's instruction would have
5:37:35 14  been to me.
5:37:44 15    Q.    Now, was the office understaffed at that
5:37:44 16  point in July 2005 -- 2004?
5:37:51 17    A.    I don't know.  At that point that I came in
5:37:54 18  there was 11 SRs, which was a large amount.  We had such
5:37:59 19  a turnover in personnel.  At that time, who's to say?  I
5:38:03 20  don't remember whether we were understaffed or
5:38:03 21  overstaffed.  We're usually understaffed.  That's
5:38:06 22  usually the typical office.
5:38:13 23    Q.    And as a result of the understaffing was it
5:38:16 24  more difficult to serve the public in a timely fashion?
*Objection: FRE 106, FRCP 32(a)(6), lines 189:25 to 190:7 should be*
5:38:19 25    A.    It's always difficult.  That's why it is ~~included~~
*included for completeness*
Overruled[20]

[20] Plaintiff must read the additional lines requested by Defendant.

| | |
|---|---|
| 5:38:22 1 | imperative that you use your time wisely. And |
| 5:38:25 2 | especially the time between 7:00 to 8:45 because that |
| 5:38:28 3 | was the only time that an SR had 97 percent of the time. |
| 5:38:33 4 | So it was imperative that the minute they |
| 5:38:33 5 | walked in that they buckled down at their desk and do |
| 5:38:35 6 | their work because we always were shortstaffed. And the |
| 5:38:38 7 | public always came first. |
| 5:38:39 8 | Q. And did it improve the service to the public |
| 5:38:42 9 | to fire one of the employees who was processing the |
| 5:38:47 10 | work? |
| 5:38:48 11 | MS. CORMIER: Objection. Argumentative. |
| 5:38:49 12 | BY MS. DRYOVAGE: |
| 18:53 13 | Q. You can answer. |
| 5.38:55 14 | A. Firing anyone, reducing the staff at any |
| 5:38:57 15 | time, that was not -- you know, it wasn't something that |
| 5:39:01 16 | you do to increase your stats by any means. It was just |
| 5:39:06 17 | something that if the problem could have been fixable |
| 5:39:11 18 | and I felt that Kimberly and I could have worked |
| 5:39:14 19 | together to accomplish the goal of serving the public |
| 5:39:19 20 | with world-class service, it wouldn't have came to that. |
| 5:39:23 21 | But Kimberly and I just could not connect no |
| 5:39:26 22 | matter how many times I tried to talk to her. |
| 5:39:28 23 | Q. And this was during the same period that |
| 5:39:30 24 | Francis was losing her eyesight and having difficulty |
| 5:39:34 25 | completing her work in a timely fashion? |

5:43:44 1                        Did you generally initiate the conversations

5:43:47 2   with Ms. Summers about Kimberly Freeman?

5:43:49 3       A.   Yes.  One of my responsibilities was to keep

5:43:54 4   my supervisor appraised of any issues that I was having

5:43:58 5   within my unit.  Because I also was in a transition

5:44:00 6   period myself.  So I was also -- my supervisory skills

5:44:05 7   were being scrutinized as well as anything else.  So I

5:44:10 8   would constantly communicate with Bobbie any issues that

5:44:15 9   came up in the unit.

5:44:16 10              And Kim was my major concern.  I was trying

5:44:20 11  so hard to make her successful, talking to her on a

5:44:25 12  constant basis.  And so therefore Bobbie and I talked

5:44:30 13  constantly.

5:44:31 14       Q.   When you went to talk to Bobbie Summers about

5:44:32 15  Kimberly Freeman, were those conversations prompted in

5:44:35 16  any way by the fact that other employees in the office

5:44:38 17  had filed grievances or were making complaints?

5:44:41 18       A.   Not at all.  It was based on issues that

5:44:44 19  Kimberly and I had directly between ourselves.  My

5:44:54 20  directives to her, my finding out that she didn't follow

5:44:54 21  them, my finding she didn't go to the counter on time.

5:44:56 22  It was just me trying to supervise Kimberly.  Those were

5:45:00 23  ~~what generated the conversations.~~

5:45:01 24       Q.   Now, you mentioned that sometimes your

5:45:03 25  employees would come to you and tell you that they

5:45:06 1  needed to have some time to, for example, go talk to the

5:45:10 2  union.

5:45:11 3         When people came to you and asked for time to

5:45:14 4  do that sort of thing, did they tell you the specifics

5:45:18 5  of why they needed to talk to the union?

Objection: FRE 401, 403, Defendant's Motion in Limine Nos. 2, 3. Sustained

5:45:23 6     A.   We as management were not permitted to ask

5:45:25 7  them.  That was between them and their union rep.   If

5:45:28 8  they chose to tell me on their own, that would be up to

5:45:30 9  them.  I never ask.  It was not policy to ask.

5:45:34 10        I simply would ask them how much time they

5:45:36 11 needed and I would look at the schedule and I would give

5:45:38 12 them a time to do so.  But if they told me on their own

5:4413 13 free will, that was up to them.

5:45:46 14        Q.   And did they sometimes tell you of their own

5:45:47 15 free will what the issue was?

Objection: FRE 401, 403, Defendant's Motion in Limine Nos. 2, 3.

5:45:50 16        A.   Yes, sometimes.                    Sustained

5:45:51 17        Q.   Can you recall an individual or individuals

5:45:54 18 who told you what their issue was in such a

5:45:58 19 circumstance?

Objection: FRE 401, 403, Defendant's Motion in Limine Nos. 2, 3 Sustained

5:46:00 20        A.   Like I said, the only one that comes to mind

5:46:03 21 is Linda because she would, you know, communicate with

5:46:03 22 me.  But the rest of the -- Noel was very much a private

5:46:11 23 person.  He never would share with me any of his issues.

5:46:15 24 Francis was very open and sometimes would say things to

5:46:19 25 me.

5:46:20 1        I knew that the unit was disgruntled. That

5:46:21 2  was obvious when I got there, but why was none of my

5:46:29 3  business. I did not get involved. And nobody gave me

5:46:29 4  any instructions in regard to the unit.

5:46:36 5       Q.    At one point while Ms. Dryovage was asking

5:46:37 6  you questions, you used the words -- and I wrote it down

5:46:40 7  in my notes in quotes -- that you quote, "Never talked

5:46:43 8  to Paula" close quotes. I'm presuming that's a little

5:46:49 9  bit of an overstatement.

5:46:51 10       Did you sometimes in fact talk to Paula

5:46:52 11  Singer?

5:46:19 12     A.    You know, if Paula told me to come in her

5:46:54 13  office, of course I would talk to her. To state that

5:46:56 14  never -- never's always a bad word because there's

5:47:00 15  always -- there's no absolutes in any world.

5:47:03 16       I'm sure I would say good morning. I'm sure

5:47:08 17  I was polite. She needed to talk to me, I talked to

5:47:12 18  her. What I was really trying to say I would very

5:47:16 19  seldom would initiate going into her office to start a

5:47:20 20  conversation.

5:47:23 21     Q.    Could you take a look at Exhibit 1 for a

5:47:26 22  moment and if you could turn to paragraph 17.

5:47:38 23     A.    (Witness complies.)

5:47:38 24     Q.    And I don't recall exactly what question

5:47:40 25  Ms. Dryovage asked you earlier. But I just wanted to

Dated: December 3, 2008

CENTRAL VALLEY REPORT
Fresno, CA  (559) 22           196

IT IS SO ORDERED
Jeffrey S. White
Judge Jeffrey S. White

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA